## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JOHN PHILLIPS, Individually and on Behalf of All Other Persons Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HARVEST NATURAL RESOURCES, INC., JAMES A. EDMISTON, and STEPHEN C. HAYNES, <br><br> Defendants. | Civil Action No.: <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff John Phillips ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Harvest Natural Resources, Inc. ("Harvest Natural" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Harvest Natural securities between May 7, 2010

and March 18, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      Harvest Natural is an independent energy company engaged in the acquisition, development, production and disposition of oil and natural gas properties.  The Company is focused on the exploration of oil and gas fields in known hydrocarbon basins worldwide.

3.      On February 20, 2013, the Company disclosed the termination of the Share Purchase Agreement between PT Pertamina (Persero) and HNR Energia B.V., a wholly-owned subsidiary of Harvest Natural.

4.      On this news, Harvest Natural securities declined $3.71 per share or 40.5%, to close at $5.45 per share on February 20, 2013.

5.      On March 19, 2013, the Company disclosed that there were certain errors in its financial statements related to, among others, the capitalization of certain lease maintenance costs and certain internal selling, general and administrative costs.  In addition, the Company disclosed that it had determined that a material weakness existed in its controls over the accuracy and presentation of its accounting for certain long-lived assets.  As a result, the Company would be required to "revise and possibly restate its financial statements for certain periods in 2010, 2011 and 2012."

6.      On this news, Harvest Natural securities plummeted $1.79 per share or more than 32%, to close at $3.70 per share on March 19, 2013.

7.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business,

operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company incorrectly capitalized certain lease maintenance costs and certain internal selling, general and administrative costs; (2) the Company improperly presented certain cash flow items and caused certain long-lived assets to be impaired;  (3) the Company was unable to sell its interests in Petrodelta S.A. to PT Pertamina (Persero); (4) the Company lacked adequate internal and financial controls; and (5) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

11.      Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as Harvest Natural's principal place of business is located within this District.

12.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, purchased Harvest Natural securities at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Defendant Harvest Natural is a Delaware corporation, with its principal place of business located at 1177 Enclave Parkway, Houston, TX 77077.  Harvest Natural's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HNR."

15.     Defendant James A. Edmiston ("Edmiston") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and President.

16.     Defendant Stephen C. Haynes ("Haynes") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

17.     The defendants referenced above in ¶¶ 15 and 16 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Harvest Natural is a petroleum exploration and production company focusing on acquiring exploration, development and producing properties in geological basins with proven active hydrocarbon systems.   In addition to its headquarters in Houston, Texas, the Company also has regional/technical offices in the United Kingdom and Singapore, and field offices in Jakarta, Republic of Indonesia; Port Gentil, Republic of Gabon; and Muscat, Sultanate of Oman to support field operations in those areas.

### Materially False and Misleading
### Statements Issued During the Class Period

19.     On May 7, 2010, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2010.  For the quarter, the Company reported net

income of $25 million, or $0.64 diluted earnings per share ("EPS") and revenue of $3 million, as compared to a net loss of $4.8 million, or ($0.15) diluted EPS for the same period a year ago. The press release stated in relevant part the following:

> The first quarter results include exploration charges of $1.2 million, or $0.03 per diluted share. Petrodelta, S.A. (Petrodelta), Harvest's Venezuelan affiliate, reported first quarter 2010 earnings of $64.0 million, $20.5 million net to Harvest's 32 percent equity interest, under International Financial Reporting Standards (IFRS). Included in Petrodelta's IFRS first quarter earnings is a gain on exchange rate resulting from a revaluation of assets and liabilities recorded by Petrodelta due to the Venezuela Bolivar/U.S. Dollar currency exchange rate devaluation announced by the Venezuelan government on January 8, 2010. After adjustments to Petrodelta's IFRS earnings, primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings was $30.7 million.

20.     On May 7, 2010, the Company filed a quarterly report for the period ended March 31, 2010 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

21.     On August 9, 2010, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2010.  For the quarter, the Company reported a net loss of $296,000, or ($0.01) diluted EPS and revenue of $2.9 million, as compared to a net loss of $4.2 million, or $0.13 diluted EPS for the same period a year ago.  The press release stated, in relevant:

> Petrodelta reported second quarter earnings of $8.7 million, $2.8 million net to Harvest's 32 percent interest, under International Financial Reporting Standards (IFRS). After adjustments to Petrodelta's IFRS earnings, primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings were $7.1 million.

Petrodelta's earnings include a nonrecurring charge of $17.1 million ($5.5 million net to Harvest's 32 percent interest) in the second quarter reflecting adjustments to the current tax expense. The impact of this nonrecurring charge, net of tax, to Harvest is $0.16 per share.

22.     On August 9, 2010, the Company filed a quarterly report for the period ended June 30, 2010 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

23.     On November 9, 2010, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2010.  For the quarter, the Company reported a net loss of $5 million, or ($0.15) diluted EPS and revenue of $1.9 million, as compared to net income of $783,000, or $0.02 diluted EPS for the same period a year ago.  The press release stated the following, in relevant part:

Excluding exploration charges, the third quarter net loss would have been $0.07 per diluted share…. Petrodelta reported a third quarter loss of $2.9 million, $0.9 million net to Harvest's 32 percent interest, under International Financial Reporting Standards (IFRS). After adjustments to Petrodelta's IFRS earnings, primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings was $4.9 million.

Certain special charges of $1.2 million recorded as Exploration Expense incurred during the third quarter related to the one time election made by Harvest's partner in the Budong PSC to increase Harvest's carry obligation by $2.7 million.  The additional carry obligation election increased Harvest's ownership in the Budong PSC by 7.4 percent to a total of 54.4 percent.

Also, Petrodelta's earnings include a special charge of $13.7 million ($4.4 million net to Harvest's 32 percent interest) in the third quarter reflecting adjustments to the current tax expense.  The special charge relates to foreign exchange losses on the revaluation of certain liabilities that are not deductible for tax purposes.

24.     On November 9, 2010, the Company filed a quarterly report for the period ended September 30, 2010 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     On March 16, 2011, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2010.  For the fourth quarter, the Company reported a net loss of $4 million, or ($0.12) diluted EPS and revenue of $2.7 million, as compared to net income of $5 million, or $0.15 diluted EPS and revenue of $181,000 for the same period a year ago.  For the year, the Company reported net income of $15.4 million, or $0.43 diluted EPS and revenue of $11 million, as compared to a net loss of $3.1 million, or ($0.09) diluted EPS and revenue of $181,000 for the same period a year ago.  The press release stated the following, in relevant part:

> Petrodelta, S.A. (Petrodelta), Harvest's Venezuelan affiliate, reported fourth quarter income from operations of $71.6 million ($22.9 million net to Harvest's 32 percent equity interest under International Financial Reporting Standards [IFRS]).  Petrodelta's fourth quarter results include a charge for $36.1 million ($11.6 million net to Harvest's 32 percent interest under IFRS) as an adjustment to the remeasurement gain resulting from the netting of 2009 PDVSA receivables and payables, and a special interest charge of $19.5 million ($6.2 million net to Harvest's 32 percent interest under IFRS) relating to the sale of foreign currency through the Central Bank. After these charges and taxes, Petrodelta reported fourth quarter earnings of $7.8 million ($2.5 million net to Harvest's 32 percent equity interest under IFRS).  After adjustments to Petrodelta's IFRS earnings, primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings was $10.2 million, a 107.1 percent increase over the prior quarter.
> Petrodelta reported income from operations for the year of $279.2 million ($89.3 million net to Harvest's 32 percent equity interest under IFRS).  Petrodelta

reported a remeasurement gain from the devaluation of the Venezuelan Bolivar (Bolivar) of a non-cash charge in the amount of $84.4 million ($27.0 million net to Harvest's 32 percent equity interest under IFRS) due to the devaluation of the Bolivar for the year offset by a special interest expense charge of $19.5 million ($6.2 million net to Harvest's 32 percent interest under IFRS) relating to the sale of foreign currency through the Central Bank. After these charges and taxes, for the year ending December 31, 2010, Petrodelta reported earnings of $77.7 million, ($24.9 million net to Harvest's 32 percent equity interest, under IFRS). After adjustments to Petrodelta's IFRS earnings, primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings was $52.9 million, a 62.4 percent increase over 2009.

26.     On March 15, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.     The Form 10-K represented the following, in relevant part, concerning the Company's liquidity position:

> As a petroleum exploration and production company, our revenue, profitability, cash flows, and future rate of growth are substantially dependent on the condition of the oil and gas industry generally, our success with our exploration program, and the belief that Petrodelta will fund its own operations and continue to pay dividends. Because our revenues are generated from customers with the same economic interests, our operations are also susceptible to market volatility resulting from economic, cyclical, weather or other factors related to the energy industry.  Changes in the level of operating and capital spending in the industry, decreases in oil or gas prices, or industry perceptions about future oil and gas prices could adversely affecting our financial position, results of operations and cash flows. Based on our current level of cash flow from operations, we will be required to raise capital to meet our general and administrative costs and fund our oil and gas programs.

28.     On May 10, 2011, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2011.  For the quarter, the Company reported net income of $800,000, or $0.02 diluted EPS, as compared to net income of $25 million, or $0.64 diluted EPS for the same period a year ago.  The press release stated the following, in relevant part:

> The first quarter results included exploration charges of $1.2 million, or $0.04 per diluted share.  Also during the first quarter the Company incurred costs from discontinued operations of $2.9 million or $0.07 per diluted share from related revenue and expenses associated with the Utah assets.  Finally, Harvest recognized a $1.3 million gain, or $0.03 per diluted share, on the sale of its equity investment in Fusion Geophysical, LLC (Fusion).  Adjusted for exploration charges, proceeds from the sale of Fusion and the losses related to the discontinued operations, first quarter 2011 earnings would have been $3.6 million or $0.10 per diluted share.

> Petrodelta reported earnings during the first quarter of $61.9 million, $19.8 million net to Harvest's 32 percent interest, under International Financial Reporting Standards (IFRS).  After adjustments to Petrodelta's IFRS earnings, primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings was $ 13.5 million.

29.     On May 10, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

30.     On August 9, 2011, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2011.  For the quarter, the Company reported net income of $90 million, or $2.24 diluted EPS, as compared to a net loss of $296,000, or ($0.01)

diluted EPS for the same period a year ago.  The press release stated the following, in relevant part:

> The second quarter results include exploration charges of $4.7 million, or $0.12 per diluted share, and a loss on the extinguishment of debt of $9.7 million, or $0.24 per diluted share. Also during the second quarter, the Company reported income from discontinued operations of $99.2 million , or $2.47 per diluted share, for revenue, expenses and gain recognized related to the sale of the Utah assets. Adjusted for exploration charges, loss from extinguishment of debt, gain from the sale of the Utah assets and the income related to the discontinued operations, second quarter 2011 earnings would have been $5.3 million, or $0.13 per diluted share.
>
> Petrodelta reported earnings during the second quarter of $47.3 million, $15.1 million net to Harvest's 32 percent interest, under International Financial Reporting Standards (IFRS).  After adjustments to Petrodelta's IFRS earnings, primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings was $14.2 million.

31.    On August 9, 2011, the Company filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.    On November 9, 2011, the Company issued a press release announcing its financial results for the second quarter ended September 30, 2011.  For the quarter, the Company reported net income of $5.1 million, or $0.14 diluted EPS, as compared to net loss of $5 million, or ($0.15) diluted EPS for the same period a year ago.  The press release stated the following, in relevant part:

The third quarter results include exploration charges of $1.6 million, or $0.04 per diluted share, and a loss from discontinued operations of $3.5 million, or $0.09 per diluted share, relating to an additional tax charge on the gain from the second quarter sale of the Utah assets.  Adjusted for exploration charges and the loss related to discontinued operations, third quarter 2011 earnings would have been $10.2 million, or $0.27 per diluted share.

Petrodelta reported earnings during the third quarter of $57.0 million, $18.2 million net to Harvest's 32 percent interest, under International Financial Reporting Standards (IFRS).  After adjustments to Petrodelta's IFRS earnings, primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings was $15.7 million.

33.     On November 9, 2011, the Company filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

34.     On March 15, 2012, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2011.  For the fourth quarter, the Company reported a net loss of $44.7 million, or ($1.30) diluted EPS, as compared to net loss of $4 million, or ($0.12) diluted EPS for the same period a year ago.  For the year, the Company reported net income of $53.9 million, or $1.37 diluted EPS, as compared net income of $15.4 million, or $0.42 diluted EPS for the same period a year ago.  Further, the press release stated the following, in relevant part:

The fourth quarter results include exploration charges of $6.3 million, or $0.18 per diluted share and dry hole expense of $49.7 million, or $1.45 per diluted share.  The dry hole expense reflects costs incurred for the Oman Block 64 wells in the amount of $9.7 million and costs related to wells drilled in the Indonesia

Budong-Budong Block during 2011 of $40.0 million.  Adjusted for these items, Harvest's fourth quarter income was $11.3 million, or $0.33 per diluted share.

For the year, Harvest incurred exploration charges of $13.7 million, or $0.35 per diluted share, dry hole expense of $49.7 million, or $1.26 per diluted share, and a loss on the extinguishment of debt of $9.7 million, or $0.25 per diluted share.  Also related to the sale of the Utah assets occurring in the second quarter, the Company reported income for the year from discontinued operations of $97.6 million, or $2.48 per diluted share, for revenue, expenses, taxes and gain recognized.  Adjusted for these items, net income for 2011 was $29.4 million, or $0.75 per diluted share.

Petrodelta, S.A. (Petrodelta), Harvest's Venezuelan affiliate, reported fourth quarter income from operations of $74.0 million ($23.7 million net to Harvest's 32 percent equity interest under International Financial Reporting Standards [IFRS]).  Petrodelta reported fourth quarter earnings of $66.2 million ($21.2 million net to Harvest's 32 percent equity interest under IFRS).  After adjustments to Petrodelta's IFRS earnings, primarily to conform to accounting principles generally accepted in the United States of America (USGAAP), Harvest's 32 percent share of Petrodelta's earnings was $14.6 million, a 44.1 percent increase over the same in 2010.

Petrodelta reported income from operations for the year of $338.5 million ($108.3 million net to Harvest's 32 percent equity interest under IFRS).  Petrodelta reported earnings of $232.5 million ($74.4 million net to Harvest's 32 percent equity interest, under IFRS).  After adjustments to Petrodelta's IFRS earnings, primarily to conform to USGAAP, Harvest's 32 percent share of Petrodelta's earnings was $57.7 million, an 8.7 percent increase over 2010.

35.    On March 15, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.    The Form 10-K represented the following in relevant part concerning the Company's liquidity position:

We incurred debt during 2010 which has imposed restrictions on us and increased our vulnerability to adverse economic and industry conditions. Our semi-annual interest expense has increased significantly, and our senior convertible notes impose restrictions on us that limit our ability to obtain additional financing. Our ability to meet these covenants is primarily dependent on meeting customary affirmative covenant clauses. Our inability to satisfy the covenants contained in our senior convertible notes would constitute an event of default, if not waived. An uncured default could result in the senior convertible notes becoming immediately due and payable. If this were to occur, we may not be able to obtain waivers or secure alternative financing to satisfy our obligations, either of which would have a material adverse impact on our business. As of December 31, 2011, we were in compliance with all of our long term debt covenants.

At December 31, 2011, we had cash on hand of $58.9 million. We believe that this cash plus cash generated from Petrodelta dividends and funding from debt or equity financing combined with our ability to vary the timing of our capital expenditures is sufficient to fund our operations and capital commitments through at least December 31, 2012. Our 8.25 percent senior convertible notes are due March 1, 2013. We expect some, if not all, debt holders will convert their debt into shares of our common stock on or before the March 1, 2013 due date. However, if the debt is not converted or is only partially converted, we believe that Petrodelta dividends and funding from debt or equity financing combined with our ability to vary the timing of our capital expenditures will be sufficient to repay the outstanding debt at March 1, 2013. However, if the Petrodelta dividend payment is not received or our cash sources and requirements are different than expected, it could have a material adverse effect on our operations.

37.     On May 10, 2012, the Company issued a press release announcing its financial results for the second quarter ended March 31, 2012.  For the quarter, the Company reported a net loss of $1.4 million, or ($0.04) diluted EPS, as compared to net income of $1.1 million, or $0.03 diluted EPS for the same period a year ago.  The press release stated in relevant part the following:

The first quarter results included exploration charges of $1.4 million, or $0.04 per diluted share, dry hole expense related to the Oman and Indonesian wells of $5.5 million, or $0.16 per diluted share, and debt conversion expense, most of which was a non cash item, of $2.4 million, or $0.07 per diluted share. Adjusted for exploration charges, dry hole expense and debt conversion expense, first quarter 2012 earnings would have been $7.9 million, or $0.23 per diluted share.

Petrodelta reported earnings during the first quarter of $52.5 million, $16.8 million net to Harvest's 32 percent interest, under International Financial Reporting Standards (IFRS).  After adjustments to Petrodelta's IFRS earnings,

primarily to conform to U.S. GAAP, Harvest's 32 percent share of Petrodelta's earnings was $13.4 million.

38.     On May 10, 2012, the Company filed a quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.     On June 21, 2012, the Company issued a press release announcing a definitive Share Purchase Agreement to sell its interests in Venezuela.  Specifically, the press release stated the following in relevant part:

> Harvest Natural Resources, Inc. (NYSE: HNR) (Harvest or the Company) today announced that its wholly-owned subsidiary, HNR Energia B.V., has signed a definitive Share Purchase Agreement (SPA) with PT Pertamina (Persero), the national oil company of Indonesia (the Buyer), to sell all of the Company's interests in Venezuela for $725.0 million in an all-cash transaction.  Net proceeds from the sale are estimated to be approximately $525.0 million after deductions for transaction related costs and taxes.
>
> The Buyer will purchase Harvest's 32 percent interest in Petrodelta, S.A. by purchasing HNR Energia B.V.'s 80 percent interest in Harvest-Vinccler Dutch Holding B.V.  The effective date of the transaction is January 1, 2012.
>
> The closing of the transaction is subject to, among other things, approval by the Government of the Bolivarian Republic of Venezuela, the Government of Indonesia in its capacity as the Buyer's sole shareholder and a majority of the Company's stockholders.  If all of the conditions to closing are not satisfied or not waived on or before March 21, 2013, either the Buyer or Harvest may terminate the SPA.  The Boards of Directors of Harvest and Pertamina have each approved the transaction.
>
> James A. Edmiston, President and CEO of Harvest, said, "The signing of the SPA represents a significant step forward in the strategic alternatives initiative we

began in 2010 and clearly validates the potential of Petrodelta's business and Harvest's twenty year partnership with PDVSA in Venezuela."

Edmiston continued, "This transaction will not only provide Harvest and its shareholders with numerous options for the future, but will also provide Petrodelta and PDVSA with a strong, well-financed international partner capable of contributing to Petrodelta's future growth."

40.     On August 9, 2012, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2012.  For the quarter, the Company reported net income of $8.2 million, or $0.20 diluted EPS, as compared to net income of $90 million, or $2.23 diluted EPS for the same period a year ago.  The press release stated the following, in relevant part:

> The second quarter 2012 results included exploration charges of $1.3 million, or $0.03 per diluted share, and $1.5 million, or $0.04 per diluted share, for transaction costs incurred related to the pending sale of our 32 percent interest in Petrodelta.  Additionally during the second quarter, Harvest incurred $1.6 million, or $0.04 per diluted share, in discontinued operations related to the settlement of all outstanding claims with a private third-party related to the Antelope project.  Excluding the exploration charges, transaction costs and settlement charges in discontinued operations, and net of the related tax benefits of $0.8 million, or $0.02 per diluted share, second quarter 2012 earnings would have been $11.8 million, or $0.29 per diluted share.

> The second quarter 2011 results included the sale of our Utah properties for a net gain of $98.7 million.

> Petrodelta reported net income during the second quarter of $72.0 million, as reported under International Financial Report Standards (IFRS), compared to $47.3 million for the same period in 2011.  Harvest's 32 percent share of Petrodelta's net income for the second quarter as reported under U.S. GAAP was $18.1 million, compared to $14.6 million, for the same period one year ago.

41.     On August 9, 2012, the Company filed a quarterly report for the period ended June 30, 2012 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX

by Defendants Edmiston and Haynes, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     On November 9, 2012, the Company issued a press release announcing its financial results for the second quarter ended September 30, 2012.  For the quarter, the Company reported net income of $5.8 million, or $0.15 diluted EPS, as compared to net income of $7.7 million, or $0.20 diluted EPS, for the same period a year ago.   The press release stated the following in relevant part:

> The third quarter 2012 results included exploration charges of $1.5 million, or $0.04 per diluted share, and $1.1 million, or $0.03 per diluted share, for transaction costs incurred related to the pending sale of our 32 percent interest in Petrodelta.  Additionally, during the third quarter, Harvest incurred $1.0 million, or $0.02 per diluted share, in debt conversion expense and $0.6 million, or $0.02 per diluted share, in discontinued operations related to income taxes.  Excluding the exploration charges, transaction costs, debt conversion expense, and discontinued operations charges, third quarter 2012 earnings would have been $10.0 million, or $0.26 per diluted share.

> Petrodelta reported net income during the third quarter of $45.7 million, as reported under International Financial Report Standards (IFRS), compared to $57.0 million for the same period in 2011.  Petrodelta's decrease in net income for the quarter was primarily due to higher operational costs of $14.2 million resulting from a 30 percent increase in salaries and related benefits retroactive to October 2011.  Harvest's 32 percent share of Petrodelta's net income for the third quarter as reported under U.S. GAAP was $16.2 million, compared to $14.8 million, for the same period one year ago.

43.     On November 9, 2012, the Company filed a quarterly report for the period ended September 30, 2012 on Form 10-Q with the SEC, which was signed by Defendants Edmiston and Haynes reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Edmiston and Haynes, stating that the financial information contained in the Form

10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

44.     The statements referenced in ¶¶ 19 - 43 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) the Company incorrectly capitalized certain lease maintenance costs and certain internal selling, general and administrative costs; (2) the Company improperly presented certain cash flow items and caused certain long-lived assets to be impaired;  (3) the Company was unable to sell its interests in Petrodelta S.A. to PT Pertamina (Persero); (4) the Company lacked adequate internal and financial controls; and (5) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

45.     On February 20, 2013, the Company issued a press release disclosing the termination of an agreement to sell interests in Venezuela.  Specifically, the Company disclosed the following in relevant part:

> Harvest Natural Resources, Inc. (NYSE: HNR) (Harvest or the Company) today announced that the Share Purchase Agreement (SPA) between PT Pertamina (Persero) and HNR Energia B.V., a wholly-owned subsidiary of Harvest, for the purchase of Harvest's interests in Venezuela for $725 million has been terminated as a result of the Government of Indonesia, in its capacity as sole shareholder of PT Pertamina (Persero), voting not to approve the transaction.  The SPA, announced on June 21, 2012, had also been subject to, among other things, the approval of the Government of the Bolivarian Republic of Venezuela and a majority of Harvest's stockholders.
> James A. Edmiston, President and CEO of Harvest, said: "While we are disappointed that the sale of our interests in Petrodelta to Pertamina was not approved by the Government of Indonesia, Harvest remains committed to exploring all possible alternatives to unlock the potential of our assets and to maximize value for our shareholders."

46.     On this news, Harvest Natural shares declined $3.71 per share or 40.5%, to close at $5.45 per share on February 20, 2013.

47.     On March 19, 2013, the Company filed a Form NT 10-K with the SEC disclosing the following in relevant part:

> In connection with the preparation of the financial statements of Harvest Natural Resources, Inc. ("we", "our" or the "Company") for the fiscal year ended December 31, 2012, and following discussions with the audit committee of our board of directors and our auditors, management concluded that the Company is unable to file its Annual Report on Form 10-K within the prescribed time period without unreasonable effort or expense due to the following:
>
> • Following discussions with the audit committee of our board of directors, management concluded that there were certain errors related to our incorrect capitalization of certain lease maintenance costs and certain internal selling, general and administrative costs. In addition we identified an error in the presentation of certain cash flow items and determined that certain long-lived assets have been impaired. Extra time is needed to determine the appropriate adjustments to such capitalized costs and the appropriate amounts by which our long-lived assets have been impaired.
>
> • During the annual audit, certain errors were identified that will require the Company to revise and possibly restate its financial statements for certain periods in 2010, 2011 and 2012.
>
> • The Company is in the process of completing its evaluation of its internal controls over financial reporting as of December 31, 2012 in accordance with Section 404 of the Sarbanes Oxley Act. Although such evaluation is not complete, the Company has determined that a material weakness existed in its controls over the accuracy and presentation of its accounting for certain long-lived assets. It is possible additional material weaknesses could be identified as a result of our analysis.
>
> ***
>
> We anticipate that our results of operations for the year ended December 31, 2012 will reflect a net loss attributable to Harvest of approximately $9.6 million, or $0.26 per diluted share, compared with net income attributable to Harvest of $51.8 million, or $1.32 diluted earnings per share, for the year ended December 31, 2011. The decrease in earnings attributable to Harvest of $61.4 million was due primarily to a decrease in net income from discontinued operations of $99.3 million, primarily resulting from the sale of our Utah assets, offset by a decrease in net operating expenses and other expenses of $37.9 million. In addition, due to

18

our liquidity position, our auditors have informed us that their opinion will include a going concern qualification.

48.    On this news, Harvest Natural securities plummeted $1.79 per share or more than 32%, to close at $3.70 per share on March 19, 2013.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Harvest Natural securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

50.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Harvest Natural securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Harvest Natural or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Harvest Natural;

- whether the Individual Defendants caused Harvest Natural to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Harvest Natural securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

55.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Harvest Natural securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Harvest Natural securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Harvest Natural securities; and (iii) cause Plaintiff and other members of the Class to purchase Harvest Natural securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

60.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Harvest Natural securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Harvest Natural's finances and business prospects.

61.     By virtue of their positions at Harvest Natural, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In

addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Harvest Natural securities from their personal portfolios.

63.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Harvest Natural, the Individual Defendants had knowledge of the details of Harvest Natural internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Harvest Natural.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Harvest Natural's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Harvest Natural securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Harvest Natural's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Harvest Natural securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

65.     During the Class Period, Harvest Natural securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Harvest Natural securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of Harvest Natural securities were substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Harvest Natural securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

68.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     During the Class Period, the Individual Defendants participated in the operation and management of Harvest Natural, and conducted and participated, directly and indirectly, in the conduct of Harvest Natural's business affairs.  Because of their senior positions, they knew the adverse non-public information about Harvest Natural's misstatement of income and expenses and false financial statements.

70.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Harvest Natural's financial condition and results of operations, and to correct promptly any public statements issued by Harvest Natural which had become materially false or misleading.

71.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Harvest Natural disseminated in the marketplace during the Class Period concerning Harvest Natural's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Harvest Natural to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Harvest Natural within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Harvest Natural securities.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of Harvest Natural.  By reason of their senior management positions and/or being directors of Harvest Natural, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Harvest Natural to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general

operations of Harvest Natural and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Harvest Natural.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dates: March 22, 2013

Respectfully submitted,

**ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND**


By: _____/s/Sammy Ford IV_____
      Sammy Ford IV
      Federal Bar Number: 950682
      Texas Bar Number: 24061331
      800 Commerce Street
      Houston, Texas  77002
      (713) 222-7211
      (713) 225-0827 Facsimile

**ATTORNEY FOR PLAINTIFF**


**OF COUNSEL:**

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS, LLP**
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665


**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS, LLP**
Patrick V. Dahlstrom
Ten North LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184


**BRONSTEIN GEWIRTZ & GROSSMAN LLP**
Peretz Bronstein
60 E. 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com