# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **JOHN PHILLIPS, EDWARD W. WALBRIDGE, and THE EDWARD W. WALBRIDGE TRUST, Individually and on Behalf of All Other Persons Similarly Situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**HARVEST NATURAL RESOURCES, INC., JAMES A. EDMISTON, and STEPHEN C. HAYNES,**<br><br>Defendants. | **Civil Action No.: H-13-801**<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs John Phillips; and Edward W. Walbridge and the Edward W. Walbridge Trust ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Amended Class Action Complaint ("CAC") against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Harvest Natural Resources, Inc. ("Harvest Natural" or "HNR" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons (other than defendants) who purchased Harvest Natural common stock between March 16, 2011 and March 18, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      Harvest Natural's business model involves acquiring interests in oil production and exploration ventures around the world through debt or other leveraged financing, recouping dividends or other cash payouts therefrom, and then "flipping" the interests for a profit.  Since the Company has been highly dependent on leveraged financing and its ability to sell properties, consistent cash flow has been critical to its success, and essential to avoid breach of lending covenants.

3.      At the outset of the Class Period, Harvest Natural was faced with a potential liquidity crisis.  The Company was "burning" more cash than receiving, and thus experiencing significant declines in cash balances.  This was due in great measure to deals that Harvest Natural had cut with the Hugo Chavez regime in Venezuela during a period of nationalization of that country's petroleum industry.

4.      Harvest Natural acquiesced to Chavez's nationalization and gave up a lucrative cash flow from of its then current oil fields, in return for a 40% interest in three other oil fields co-owned with a nationalized oil and gas company, Petrodelta S.A. ("Petrodelta").   The Government of Venezuela owned the other 60% interest in Petrodelta, and was its only customer. Petrodelta accounted for over 58% of Harvest Natural's $488.2 million in assets (at the end of

2010), and provided a significant counterweight to the Company's long-term debt which totaled $92 million.

5.      Prior to the Class Period, dividends paid out by Petrodelta were Harvest Natural's "primary source" of cash.  However, at least as early 2009, Harvest Natural knew that the Chavez regime dictated that Petrodelta plowed most of its cash back to "operations," and ultimately back to the Venezuelan Government to fund Chavez's social welfare policies and boost the country's sagging economy.  Moreover, the Chavez regime failed to pay for all the oil it purchased, further impairing Petrodelta's cash flow.  As if that was not enough, the Chavez regime imposed a windfall tax upon Petrodelta's sales, thus further limiting Petrodelta's ability to benefit from any increase in oil prices.

6.      As a result, Petrodelta paid no dividend in 2009, and paid a significantly reduced dividend in October 2010.  While Petrodelta also declared a second, significantly reduced, dividend in November 2010, the dividend was still unpaid at outset of the Class Period.  Moreover, the value of Harvest Natural's interest in Petrodelta clearly became impaired by all the steps being taken by the Chavez regime to limit payments to, and distributions by, Petrodelta.

7.      With its cash flow materially impaired and future prospects dimming, in October 2010 Harvest Natural embarked on a "strategic plan" to raise short term capital, sell assets, and extricate itself from the partnership with the Chavez regime, in order to avoid any "going concern" qualification by its auditors that would result in breach of its loan covenants.  To make the plan work, Defendants embarked on a fraudulent scheme to "cook the books" and materially inflate the value of the investment in Petrodelta, thereby distorting Harvest Natural's appearance of liquidity to potential purchasers of Petrodelta, as well as to Lead Plaintiffs and other investors.

3

8.      In connection with the fraudulent scheme, starting with year-end 2010 financial statements issued in March 2011, Defendants failed to recognize impairments of Harvest Natural's investment in Petrodelta and a $12.2 million dividend receivable from Petrodelta; improperly accounted for Warrants issued in connection with desperately needed financing (in order to reduce expenses related therewith); and improperly capitalized rather than expensed material amounts of exploration related costs.

9.      As a result of all the foregoing, throughout the Class Period, Harvest Natural's expenses were materially understated, its earnings materially overstated, its assets materially inflated, its debt to equity ratio materially distorted, and its stock price materially inflated.

10.      The foregoing manipulations and scheme were motivated by Defendants' desire to facilitate unwinding the deal made with the Chavez regime, as well as to conceal the depth of problems with Harvest Natural's largest asset and primary source of cash, the disclosure of which would render the Company's investment in Petrodelta unmarketable, as well as trigger a "going concern" qualification for Harvest Natural's own financial statements.

11.      The market's awareness of the true fragility of the Harvest Natural's financial condition first began to emerge on February 20, 2013, when the Company disclosed that the previously announced sale of its interests in Petrodelta to the Government of Indonesia had been cancelled.  Among other things, this signaled to investors not only that Harvest Natural would be unable to raise critically needed cash, but that the carrying value of Harvest Natural's investment in Petrodelta was likely impaired, and that it was highly uncertain that the Company would ever collect the long overdue $12.2 million dividend withheld by the Chavez regime (still booked as an unimpaired asset), or any other future Petrodelta related cash distributions.

4

12.     As a result of this partial disclosure, Harvest Natural's stock price fell over 33%, from $9.16 per share to $5.45 per share.

13.     On March 19, 2013, Defendants dropped another bombshell when they admitted that Harvest Natural's previously reported financial statements for year end 2010 through the third quarter of 2012 were materially false and had to be restated, and that the Company's auditors' report on Harvest Natural's 2012 financial statements would include a "going concern" qualification.

14.     On this devastating news, Harvest Natural shares fell another $1.79 per share, more than 32%, to close at $3.70 per share on March 19, 2013.

15.     It was not until May 2, 2013, that investors learned the full extent of Defendants' fraudulent scheme with the filing of the Company's restated financial reports. The impact of the restatement varied from quarter to quarter, ranging as high as adjustment of 391% for the first quarter of 2011, and 24% for the second quarter of 2012. The restatement further showed that the Company's debt to equity ratio had been materially distorted at the outset of the Class Period by at least 11.9%.

16.     On June 21, 2013, the Company announced that it had replaced its long time outside auditors, PricewaterhouseCoopers LLP ("PwC") with UHY LLP.

17.     The Company's financial condition remains perilous. As of June 24, 2013, its stock was selling at $3.05 per share.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

20.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as Harvest Natural's principal place of business is located within this District.

21.     In connection with the acts, conduct and other wrongs alleged in this CAC, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Lead Plaintiffs, as set forth in their previously filed Certifications, purchased Harvest Natural common stock at artificially inflated prices during the Class Period and have been damaged thereby.

23.  Defendant Harvest Natural is a Delaware corporation headquartered at 1177 Enclave Parkway, Houston, TX 77077.

24.     Defendant James A. Edmiston ("Edmiston") was, at all relevant times, the Company's Chief Executive Officer ("CEO"), President and a member of the Company's Board of Directors.

25.     Defendant Stephen C. Haynes ("Haynes") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

26.     The Defendants referenced above in ¶¶ 24 and 25 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background
**Pre-Class Period Liquidity Issues**

27.     Harvest Natural is a petroleum exploration company that specializes in collaborating with other companies and countries to identify, drill and develop oil producing properties.  Generally speaking, when the properties are demonstrated to be capable of producing oil, the Company sells its interests to other with the financial depth to fund full production.

28.     As a result of this business model, up to and during the Class Period, the Company had no sales revenue stream, but instead was dependent upon Petrodelta cash distributions, proceeds from issuance of long-term debt, and sales of assets to offset exploration, overhead, and interest expenses and debt repayments.

29.     Prior to the Class Period, this business model worked well.  The Company's largest asset was Petrodelta, which had a book value of $288 million.  Petrodelta generated a substantial dividend stream - $93.3 million to Harvest Natural in 2008 alone, which continued to be Harvest Natural's "primary source of cash" during the Class Period.

30.     Harvest Natural acquired its interest in Petrodelta in September 2007 from the Bolivarian Republic of Venezuela when then President Hugo Chavez was nationalizing Venezuelan oil fields.  While major companies refused to deal with the Chavez regime, and instead filed expropriation claims with International Trade Court, Harvest Natural decided to deal, and traded interests in three fields for a 40% share of Petrodelta.

31.     However, Harvest Natural's financial profile became highly uncertain when, in the second quarter 2009, the Chavez regime, which not only owned a 60% interest in Petrodelta but was its sole customer, imposed significant financial constraints on Petrodelta.  Going forward, Petrodelta would no longer distribute substantial amounts of cash, but rather reinvest

most, if not all, of the surplus in its "own operations." Moreover, the Chavez regime made clear that it would "claw back" a substantial amount of profits that Petrodelta could realize from increase in oil prices by imposing a special "windfall profits tax" on sales. All of this was consistent with the Chavez Government's social reinvestment policies. Moreover, Venezuela significantly limited its payments for the oil purchased from Petrodelta, thus leaving the company with very little cash on hand. Indeed, at year end 2010, Petrodelta had only $2.3 million in cash.

32.     As a result, Harvest Natural's cash cow went virtually dry. No dividends were paid out in 2009. A dividend which netted only $12.2 million to Harvest Natural's subsidiary was finally declared in August 2010, and paid in October 2010. However, this represented a nearly 90% reduction of the prior dividend levels.

33.     While Petrodelta declared a second dividend in November 2010 - $12.2 million net to a Harvest Natural subsidiary - the dividend was not funded, and to this day has not been paid.

34.     As a result of the loss of the Petrodelta dividend stream, Harvest Natural's cash balances shriveled in the quarters immediately before the Class Period:

> a.   End of Q1 2010: $44.1 million
>
> b.   End of Q2 2010: $31.5 million
>
> c.   End of Q3 2010: $13.3 million

35.     In an effort to address shareholder concerns about this cash crisis, on September 27, 2010, Harvest Natural announced that it had hired Bank of America Merrill Lynch to advise the Company in "exploring a broad range of strategic alternatives for enhancing shareholder value" including "possibly, a sale of assets or a sale of merger of the Company."

36.     A short term patch for the liquidity problem arose on October 29, 2010, when the Company announced that it had entered into a $60 million financing arrangement (the "Loan Facility") with MSD Energy Investments Private II, LLC ("MSD"). MSD is a shareholder of the Company and owns a portion of the Company's outstanding $32 million 8.25% Senior Convertible Notes, which were issued in February 2010.

37.     Under the terms of the Loan Facility, MSD lent Harvest Natural $60 million at rates ranging from 10% to 15% for a two year term. The Loan Facility also included a Warrant Purchase Agreement ("WPA") which obliged Harvest Natural, without the receipt of any additional consideration, to convey up to 6 million warrants on a "cashless exercise basis" pursuant to a pre-set price formula. The Warrants had a five year exercise period.

38.     As Petrodelta's oil production increased in 2011, the Chavez regime introduced a new round of windfall taxes on revenue pegged to the price of oil, demanding that companies operating in Venezuela return 80% of revenue above $70 per barrel, 90% above $90 per barrel, and 95% above $100 per barrel. Any excess cash flow from production that would have gone to pay dividends or increase drilling was diverted to support the Chavez regime. Accordingly, Petrodelta withheld paying any dividends to Harvest Natural.

39.     The only fix for the Company was to sell its interests in Petrodelta. To that end, Harvest Natural aggressively pursued suitors and touted its sale of Petrodelta to an Indonesian owned petroleum company.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

40.     Throughout the Class Period, statements issued by Defendants were materially false and misleading because Harvest Natural:

      a.  Improperly recorded the $12.2 million unpaid Petrodelta dividend as a receivable, when it should have been written off, or reserved against;

      b.  No later than year end 2011, improperly reported the Company's investment in Petrodelta without recognizing a material impairment thereon;

      c.  Improperly accounted for $15 million of Warrants issued in connection with a $60 million MDS Loan Facility entered by;

         (i)  classifying the Warrants as "equity" rather than "liabilities;"

         (ii)  failing to mark-to-market the value of the Warrants on a quarterly basis; and

         (iii)  understating the value of the Warrants by over 25% (and thus reducing expenses).

      d.  Improperly capitalized rather than expensed significant amounts of exploration related costs, resulting in materially overstating reported earnings 2010 through third quarter 2012.

41.     As a result, Harvest Natural's expenses were materially understated, its earnings materially overstated, its assets materially inflated, its debt to equity ratio materially distorted, and its stock price materially inflated.

**Year End 2010 Financial Results**

42.     On March 16, 2011, Harvest Natural issued a press release and filed a Form 10-K with the SEC setting forth results for the year ended December 31, 2010.  The Company reported

net income of $15.442 million, or $0.42 diluted earnings per share ("EPS"), as compared to a net loss of $3.107 million, or ($0.09) diluted EPS for the same period in the prior year.[1]

43.     Utilizing the "Successful Efforts Method" methodology to account for its exploration of oil and gas properties, the Company reported annual exploration expenses of $8.016 million.

44.     The Form 10-K accounted for a $60 million Loan Facility with warrants entered into with MSD in October 2010 as follows:

- The Warrants were booked as equity valued at $11.1 million.

- The $11.1 million value of the Warrants was also recorded as a discount on the $60 million Loan Facility (the "Warrant Related Discount"), thereby reducing Harvest Natural's reported liability balance to $48.9 million.

- The $11.1 million Warrant Related Discount was amortized over five years, the outstanding period of the Warrants.

45.     The carrying value of the Petrodelta investment was reported at $287.9 million without any impairment.

---

[1] Unless indicated otherwise, the "original" financial results for the year ended December 31, 2010 and quarterly periods for March 31, 2011, June 30, 2011 and September 30, 2011 referenced throughout this CAC are based on the Company's revised reported historical financial statements in its Form 10-K for the year ended December 31, 2011 filed on March 15, 2012.

In its Form 10-Q for the first quarter of 2011, the Company classified its Utah operations as discontinued operations and changed its previously reported financial results to conform to this change. Furthermore, in its 2011 Form 10-K, the Company further revised its historical financial statements for the year ended December 31, 2010 and quarterly information for the quarters March 31, 2010 through September 30, 2011 relating "to the correction of an error in the deferred tax adjustment to reconcile our share of Petrodelta's net income reported under International Financial Reporting Standards ('IFRS') to that required under accounting principles generally accepted in the United States of America ('USGAAP') and recorded within Net income from unconsolidated equity affiliates." Due to Petrodelta having an incorrect tax basis associated with its asset retirement cost, the Company overstated or understated the deferred tax expense. Accordingly, the Company revised the tax basis to record the correct deferred tax expense in each reporting period.

46.     As a result of the foregoing Harvest Natural's Debt to Equity ratio as of year-end 2010 was 0.296.[2]

47.     Defendants assured investors that [a]*s of December 31, 2010, we were in compliance with all of our long term debt covenants.* (Emphasis Supplied)

48.     The Form 10-K was signed by Defendants Edmiston and Haynes, contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by signed Defendants Edmiston and Haynes, stating that the financial information contained in the financial reports was accurate ("SOX Certifications").

49.     The foregoing statements were materially false and misleading for reasons set forth in ¶¶ 40-41, as further detailed below at ¶¶ 107-145.

**March 22, 2011 Statement Regarding Liquidity**

50.     On March 22, 2011, Harvest Natural announced it had agreed to sell its share of oil and gas assets in Utah's Uinta Basin for $215 million in cash.  This would enable Harvest Natural to pay off the entire balance of the MSD Loan Facility and retire a portion of the Loan Facility Warrants, though a portion of the Warrants would remain on the books until the expiration of the five year exercise period.  The agreement was not scheduled to close until after the end of the first quarter.

51.     In an effort to boost the Company's liquidity image, during a conference call with analysts that day, Defendant Edmiston stated:

> First, the proceeds of the sale will allow us to pay down the $60 million loan from MSD Capital. In doing so, Harvest will avoid both the increase in interest rate from 10% to 15%, but more importantly will avoid the dilution of 4.4 million warrants attached to the note, which vest at that time. Further, we estimate that we will avoid funding about $260 million in capital costs associated with developing

---

[2] Based on amounts reported in the original filing.

the assets over the next three years based on our development plan, which likely will require selling equity to do.

*[I]nasmuch as the process is concerned, this sale makes it very clear that Harvest is under no duress, and that the thought of a possible distress sale is off the table.*

[Emphasis added]

52.     The foregoing statement was false and misleading given all the problems with its investment in Petrodelta.  Harvest Natural was clearly "under duress," the degree to which was disguised by Defendants' fraudulent presentation of the Company's financial statements.

**First Quarter 2011 Results**

53.     On May 10, 2011, Harvest Natural issued a press release and filed its Form 10-Q reflecting results for the first quarter ended March 31, 2011.  The Company reported net income of $1.082 million or $0.02 diluted EPS, as compared to net income of $24.6 million, or $0.64 diluted EPS for the same period a year ago.  The Company's first quarter results included exploration expenses of $1.189 million.

54.     The Warrants continued to be booked as equity at their initial $11.1 million value. The Warrant Related Discount was reduced to $10.2 million to account for amortization.

55.     The unpaid Petrodelta dividend was booked as an unimpaired current asset at $12.2 million.  By classifying it as "current," Defendants represented that the dividend was likely to be collected within the next 12 months.[3]

56.     The carrying value of the Petrodelta investment was reported at $292.6 million without any impairment.[4]

_____

[3] Current asset classification is used to designate cash and other assets or resources commonly identified as those that are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business. (Accounting Standards Codification ("ASC") Glossary)  Current assets generally include receivables from affiliates and others if collectible in the ordinary course of business within a year.  (ASC 210-10-45-1)  A one-year time period shall be used as a basis for the segregation of current from non-current assets in the absence of a clearly defined operating cycle. (ASC 210-10-45-4).

13

57.     The Debt to Equity ratio was 0.31.[5]

58.     The Form 10-Q and SOX Certifications were signed by Defendants Edmiston and Haynes.

59.     The foregoing statements were materially false and misleading for reasons set forth in ¶¶ 40-41, as further detailed below at ¶¶ 107-145.

**July 18, 2011 Statement Regarding Liquidity**

60.     On July 18, 2011, at the 2011 Global Hunter Securities Conference, Defendant Edmiston represented the following concerning the Company's liquidity position:

> The very strong balance sheet, the sale of Utah allowed us to eliminate about $60 million in debt that we had on the books, so basically the only debt outstanding with Harvest is $32 million worth of converts. So, we do have some room obviously for more leverage, but we've got more than enough cash on the balance sheet to complete our drilling program and appraisal of any discoveries here. *So we feel like we are in a very, very strong position.*

(Emphasis Supplied)

61.     The foregoing statement lacked a reasonable basis given the significant problems the Company faced in being able to generate any cash or value from Petrodelta, its largest asset.

**Second Quarter 2011 Financial Results**

62.     On August 9, 2011, Harvest Natural issued a press release and filed a Form 10-Q reflecting results for the second quarter ended June 30, 2011. The Company reported net income of $89.780 million, or $2.23 diluted EPS, as compared to a net loss of $296,000, or ($0.01) diluted EPS for the same period a year ago. The second quarter results included exploration expenses of $4.650 million.

---

[4] Based on amounts reported in the original filing.

[5] Based on amounts reported in the original filing.

63.     The reported results included accounting for the early payoff of the MSD Loan Facility which had taken place on May 17, 2011.   The payoff was booked as a "loss on extinguishment of debt" totaling $9.682 million due to:

           a.   A loss of $7.2 million for the write-off of the unamortized balance of the Warrant Related Discount;

           b.   A loss of $2.1 million for the prepayment penalty of 3.5% of the loan balance;

           c.   A loss of $0.3 million for the write-off of the unamortized balance of the deferred financing costs related to the term loan facility; and

           d.    In addition, $2.7 million was "reversed out of additional paid in capital" to account for the redemption of a portion of the Warrants.

64.     The unpaid $12.2 million Petrodelta dividend continued to be booked as an unimpaired current asset.

65.     The remaining portion of the Warrants ($8.4 million) continued to be reported within the additional paid in capital (rather than as a liability).

66.     The carrying value of the Petrodelta investment was reported at $310.4 million without impairment.[6]

67.     The Form 10-Q and SOX Certifications were signed by Defendants Edmiston and Haynes.

68.     The foregoing statements were materially false and misleading for reasons set forth in ¶¶ 40-41, as further detailed below at ¶¶ 107-145.

---

[6] Based on amounts reported in the original filing.

**Third Quarter 2011 Results**

69.     On November 9, 2011, Harvest Natural issued a press release and filed its Form 10-Q for the third quarter ended September 30, 2011.  The Company reported net income of $7.711 million, or $0.20 diluted EPS, as compared to net loss of $5 million, or ($0.15) diluted EPS for the same period a year ago.  The third quarter results included exploration expenses of $1.575 million.

70.     The remaining portion of the Warrants ($8.4 million) continued to be reported within the additional paid in capital (rather than a liability).

71.     The Company continued to report the $12.2 million Petrodelta dividend as an unimpaired current asset.

72.     The carrying value of the Petrodelta investment was reported at $330 million without impairment.[7]

73.     The Form 10-Q and the SOX Certifications were signed by Defendants Edmiston and Haynes.

74.     The foregoing statements were materially false and misleading for reasons set forth in ¶¶ 40-41, as further detailed below at ¶¶ 107-145.

**Year End 2011 Results**

75.     On March 15, 2012, Harvest Natural issued a press release and filed its Form 10-K reflecting results for the year ended December 31, 2011.

76.     For the year, Harvest Natural reported net income of $53.894 million, or $1.37 diluted EPS, compared net income of $15.4 million, or $0.42 diluted EPS for the same period a year ago which included exploration expenses of $13.690 million and loss on the extinguishment of debt of $9.682 million.

---

[7] Based on amounts reported in the original filing.

77. The $12.2 million unpaid Petrodelta dividend continued to be booked as an unimpaired current asset.

78. The carrying value of the Petrodelta investment was reported at $345 million without impairment.

79. With respect to its liquidity position, Defendants represented that "as of December 31, 2011, we were in compliance with all of our long term debt covenants."

80. The Form 10-K and SOX Certifications were signed by Defendants Edmiston and Haynes.

81. The foregoing statements were materially false and misleading for reasons set forth in ¶¶ 40-41, as further detailed below at ¶¶ 107-145.

**Conversion of 50% of Convertible Notes into Common Stock**

82. On March 9, 2012, the Company announced that it entered into exchange agreements with certain existing note holders of its 8.25% senior convertible notes, pursuant to which the note holders would exchange $15,984,000 of the notes for 2,875,357 shares of Harvest Natural common stock, resulting in an effective exchange price of $5.56 per share. In addition, in lieu of cash, the Company agreed to issue to the note holders 161,603 shares of common stock at $8.16 per share in exchange for foregoing a one year interest payment of $1,318,680.

**Potential Sale of Petrodelta**

83. Though the Company professed to have sufficient liquidity to comply with all loan covenants, it still desperately needed to raise cash, quickly, in order to fund ongoing operations and meet other debt obligations. In that regard, on March 6, 2012, the Company announced that it "commenced exclusive negotiations with a third party for the possible sale of its" interest in Petrodelta. Immediately, analyst Chad Mabry at Rodman & Renshaw LLC noted,

"While no dollar amounts were provided, news of an imminent sale has nonetheless put a charge into shares today." On this news, Harvest Natural shares gained $1.44 per share, or 23%, to close at $7.70 per share on March 6, 2012.

**First Quarter of 2012 Results**

84.    On May 10, 2012, Harvest Natural issued a press release and filed its Form 10-Q reflecting results for first quarter ended March 31, 2012. The Company reported a net loss of $1.392 million, or ($0.04) diluted EPS, as compared to net income of $1.082 million, or $0.03 diluted EPS for the same period a year ago. For the quarter, the Company also reported exploration expenses of $1.443 million. Defendants reaffirmed that, "As of March 31, 2012, we were in compliance with all of our long term debt covenants."

85.    The $12.2 million unpaid Petrodelta dividend continued to be booked as an unimpaired current asset.

86.    The Petrodelta investment continued to be reported without any impairment at $361.8 million.

87.    The Form 10-Q and SOX Certifications were signed by Defendants Edmiston and Haynes.

88.    The foregoing statements were materially false and misleading for reasons set forth in ¶¶ 40-41, as further detailed below at ¶¶ 107-145.

**Proposed Agreement to Sell Petrodelta**

89.    On June 21, 2012, Harvest Natural announced that it had entered into a purported agreement to sell its interest in Petrodelta for $725 million to a company owned by the Government of Indonesia. The sale was subject to approval by the Governments of Venezuela and Indonesia.

18

**Second Quarter 2012 Results**

90.     On August 9, 2012, the Company issued a press release and filed a Form 10-Q reflecting results for the second quarter ended June 30, 2012.  The Company reported net income of $8.160 million, or $0.20 diluted EPS, as compared to net income of $89.780 million, or $2.23 diluted EPS for the same period a year ago.  The Company reported exploration expenses of $1.282 million.

91.     The $12.2 million unpaid Petrodelta dividend continued to be booked as an unimpaired current asset.

92.     The Petrodelta investment continued to be reported without any impairment at $384.5 million.

93.     The Company reiterated that "as of June 30, 2012, we were in compliance with all of our long term debt covenants."

94.     The Form 10-Q and SOX Certifications were signed by Defendants Edmiston and Haynes.

95.     The foregoing statements were materially false and misleading for reasons set forth in ¶¶ 40-41, as further detailed below at ¶¶ 107-145.

**Placement of the 11% Senior Notes**

96.     With the cessation of payments from Petrodelta, Harvest Natural's Cash On Hand rapidly declined, as demonstrated in the chart below.

| Quarter | Cash On Hand at End of Quarter |
|---------|--------------------------------|
| 4Q2011  | $58.95 million                 |
| 1Q2012  | $33.55 million                 |
| 2Q2012  | $28.75 million                 |
| 3Q2012  | $20.42 million                 |

97.     To address this perilous cash drain, on October 11, 2012, the Company entered into a Securities Purchase Agreement under which it sold to certain purchasers $79.8 million aggregate principal amount of 11% senior unsecured notes *due October 11, 2014*, and warrants to purchase 686,761 shares of its common stock with an exercise price of $10.00 per share.  The net cash proceeds of the offering to the Company were approximately $63.2 million.

**Third Quarter 2012 Results**

98.     On November 9, 2012, Harvest Natural issued a press release and filed its Form 10-Q reflecting results for the third quarter ended September 30, 2012.  The Company reported net income of $5.817 million, or $0.15 diluted EPS, as compared to net income of $7.7 million, or $0.20 diluted EPS, for the same period a year ago.  The Company reported exploration expenses of $1.475 million.

99.     The Company reclassified the $12.2 million unpaid Petrodelta dividend from current to long-term asset category on its balance sheet but continued to report it as an unimpaired asset.

100.     The Petrodelta carrying value continued to be reported without impairment at $404.7 million.

101.     Defendants reiterated that "as of September 30, 2012, we were in compliance with all of our debt covenants."

102.     The Form 10-Q and related SOX Certifications were signed by Defendants Edmiston and Haynes.

103.     The foregoing statements were materially false and misleading for reasons set forth in ¶¶ 40-41, as further detailed below at ¶¶ 107-145.

20

**Cancellation of the Petrodelta Sale**

104. On February 20, 2013, the Company issued a press release disclosing that the sale of Petrodelta had been canceled by the proposed buyer, the company owned by the Government of Indonesia. On information and belief, the cancellation was due to the Government of Indonesia's determination, after conducting due diligence (using materials equally available to Defendants), that it was unlikely that Petrodelta would pay any dividends in the foreseeable future.

105. Defendant Edmiston sought to offset this significant setback by insisting that "Harvest remains committed to exploring all possible alternatives to unlock the potential of our assets and to maximize value for our shareholders."

106. Indicative of the market's heightened concerns regarding Harvest Natural's liquidity, its shares immediately plummeted $3.71 per share to close at $5.45 per share on February 20, 2013.

## THE FALSE AND MISLEADING NATURE OF THE FOREGOING STATEMENTS
**Improper Accounting for Dividends Due From, and Investment in, Petrodelta**

107. In Harvest Natural's Form 10-K for the year ended 2009, the carrying value of the Company's investment in Petrodelta was reported as $234 million.[8]

108. As the Company acknowledged in its Form 10-K for year end 2008 (issued March 13, 2009), the future cash distributions from Petrodelta were highly problematic:

> **We expect to receive future dividends from Petrodelta; however, we expect the amount of any future dividends to be much lower over the next several years as Petrodelta reinvests more of its earnings into the company in support of its drilling and appraisal activities.** In addition to reinvesting earnings into the company in support of its drilling and appraisal activities, the recent decline in the price per barrel affects Petrodelta's ability to pay dividends.

---

[8] Based on amounts reported in the original filing.

> Until oil prices increase, all available cash will be used to meet current operating requirements and will not be available for dividends.

(Emphasis Supplied)

109.   The fact that the Chavez Government was the majority owner of Petrodelta, and had clearly imposed restrictions on the outflow of cash from the company, indicated that Harvest Natural's ability to recoup its investment had also become highly uncertain at this time.

110.   Harvest Natural admitted to such uncertainty in its 2010 Form 10-K:

> While we believe that Petrodelta will reinvest any excess cash which might be available for payment of dividends into Petrodelta in 2011 and 2012, there is no assurance this will be the case, nor that if the cash is not reinvested that it will be paid as dividends. (Emphasis Supplied)

111.   Harvest Natural further revealed that "Petrodelta [had] set up a reserve within the equity section of its balance sheet for deferred tax asset" meaning that Petrodelta recognized the likelihood that any further payouts would be subject to significant tax levies by the Chavez regime.

112.   The $12.2 million Petrodelta dividend was declared in November 2010 and was initially recorded by the Defendants in the first quarter of 2011 at full value as a current receivable.[9]

113.   The likelihood of recovering any dividends, or the full value of the reported investment in Petrodelta, became admittedly more uncertain in 2011.  In its Form 10-K for year-end 2011, Harvest Natural acknowledged that the Chavez regime's decision to limit Petrodelta's payments for contractors working on Petrodelta's operations, and payments to Petrodelta for the Government's purchase of hydrocarbons, were also impacting the likely cash payout from that company:

---

[9]   Current classification implied that the Defendants expected to collect the dividend within one year of March 14, 2011, when the dividend was approved by Petrodelta's shareholders.

Due to Petrodelta's liquidity constraints caused by [Venezuelan affiliated contracting company] insufficient monetary and contractual support, as of March 7, 2012, this dividend has not been received, and the timing of the receipt of this dividend is uncertain.

114.    At this juncture, it was incumbent upon Defendants to recognize an impairment of the $12.2 million dividend due from Petrodelta.

115.    Equally, if not more significant, but for a reckless disregard of the truth, Defendants should also have recognized a material impairment for Harvest Natural's investment in Petrodelta at least as early as year-end 2011.

116.    Petrodelta's sole customer was the Chavez regime.  Thus, not only did Venezuela impose significant restrictions on Petrodelta's cash distributions and taxes on income, but it also controlled the company's entire cash flow, since the timing of payments due was entirely up to the Chavez regime.

117.    As the chart below demonstrates, since 2008, while Petrodelta's sales grew significantly, so did the amount due from the Chavez regime.  Between 2008 and 2011 the Accounts Receivable had ballooned from $267 million to $933 million, an *increase* of over three-fold.  In contrast, Petrodelta's Cash and Cash Equivalents On Hand had shrunk from $7.3 million in 2008, to a mere $2.3 million in 2011, a *decrease* of over three-fold.

| | 2008 | % of Sales | 2009 | % of Sales | 2010 | % of Sales | 2011 | % of Sales | 2012 | % of Sales |
|---|---|---|---|---|---|---|---|---|---|---|
| Sales | $474,619 | | $458,251 | | $607,586 | | $1,048,728 | | $1,160,653 | |
| Income tax | (241,981) | 51.0% | (223,817) | 48.8% | (489,654) | 80.6% | (633,672) | 60.4% | (822,002) | 70.8% |
| Net Income | $121,217 | | $142,430 | | $ 78,000 | | $ 232,460 | | $ 85,993 | |
| | | % of Total Assets | | % of Total | | % of Total | | % of Total Assets | | % of Total |
| Total Assets | $620,100 | | $814,165 | | $925,318 | | $1,544,913 | | $2,101,999 | |
| Cash and cash equivalents | $ 7,363 | | $ 3,062 | | $ 3,465 | | $ 2,342 | | $ 3,335 | |
| Accounts Receivable | $ 267,786 | 43.2% | $368,979 | 45.3% | $506,356 | 54.7% | $922,788 | 59.7% | 1,313,302 | 62.5% |

23

118.    Under the circumstances, it was incumbent that Harvest Natural recognize an impairment for its Petrodelta investment at least as of year-end 2011.

119.    Harvest Natural's accounting policy was to "review our Investment in Equity Affiliates [such as Petrodelta] for impairment whenever events and circumstances indicate a decline in the recoverability of its carrying value." (2011 Form 10-K, page S-8).

120.    At the time when Harvest Natural filed its 2011 Form 10-K on March 15, 2012, its Petrodelta dividend receivable had been outstanding and uncollected for over a year. Moreover, Petrodelta's Cash On Hand was minimal, and payments due from its sole customer, the Chavez Government, were exponentially increasing.  The Defendants therefore should have not only reserved a portion of the current dividend receivable as uncollectible, but also evaluated whether the carrying value of Harvest Natural's investment in Petrodelta had become impaired, thereby warranting recognition of a charge against earnings.

121.    Moreover, given Petrodelta's financial structure, Harvest Natural's interests extended only to Petrodelta's distributable cash flow, but *not* its underlying asset value:

      a.  As disclosed in the notes to Petrodelta's 2010 financial statements, Petrodelta's capital structure consists of two types of shares.  A subsidiary of the Venezuelan state-owned oil and natural gas company owns Class A stock which gives it 60% ownership interest.  Harvest Natural's subsidiary owns Class B stock which gives it 40% ownership.

      b.  According to Petrodelta's by laws, "in case of Company liquidation, all assets will be transferred only to the Class "A" shareholder." (2010 Form 10-K, page S-88).

24

    c.  Thus, Harvest Natural's investment interest entitles it only to a 40% share of Petrodelta's distributable earnings, and *no share of Petrodelta's net assets.*

    d.  Therefore, in evaluating its carrying value of investment in Petrodelta for impairment purposes, Harvest Natural should have determined the fair value of this investment based only on Harvest Natural's forecast of expected future dividends to be received, which were nil at the time.

122.    However, Defendants disregarded Petrodelta's cash distribution constraints, representing only that that "at December 31, 2011… , there were no events that caused us to evaluate our investment in equity affiliates for impairment" (2011 Form 10-K, page S-8).  In so doing, Defendants violated the GAAP requirement that a loss in value of an investment that is other than a temporary decline to be recognized:

> [E]vidence of a loss in value might include, but would not necessarily be limited to, absence of an ability to recover the carrying amount of the investment or inability of the investee to sustain an earnings capacity that would justify the carrying amount of the investment.  A current fair value of an investment that is less than its carrying amount may indicate a loss in value of the investment. … All are factors that shall be evaluated." (ASC 323-10-35-32)

123.    It was not until the second quarter 2012 that Harvest Natural finally admitted that under its valuation methods, the Petrodelta investment had sustained a "loss in value." Despite this acknowledgment, Harvest Natural still refused to recognize an impairment, insisting that "[T]here were no events that would indicate that our equity investment in Petrodelta had sustained a loss in value that is other than *temporary.***" (Q2'2012 Form 10-Q, page 8) (Emphasis supplied)

124.    Finally, in the third quarter 2012, Defendants belatedly reclassified the Petrodelta $12.2 million dividend receivable from "current" to "long-term."  This was a further admission of impairment:

a. Short-term notes receivable are reported at their net realizable value, which is the non-discounted amount of future net cash flows. (CON 5 ¶ 67.d)  Long-term notes receivable are reported at the discounted present value of their future net cash flows. (CON 5 ¶ 67.e)  A note or a loan is considered impaired when it is probable that the creditor will be unable to collect all the contractual interest and principal payments. (ASC 310-10-35-2)  In that case, the creditor records a loss which represents the difference between a note's carrying value and the discounted present value of the expected future cash flows. (ASC 310-10-35-22)

125.    Given the substantial lapse of time and the political and economic risks faced by Petrodelta, at least by the time the Defendants filed Harvest Natural's 2011 Form 10-K - and certainly no later than the third quarter of 2012 - it was incumbent on the Company to recognize a reserve to account for the uncertainty of receipt of a portion, if not all, of the Petrodelta related assets.

126.    Creation of a reserve would have resulted in a material charge against earnings, thereby reducing reported income.  Even a modest 10% impairment of the December 31, 2011 carrying value of the Petrodelta investment alone would have reduced Harvest Natural's 2011 Net Income by $27.6 million (a 30% reduction of the reported amount).  Additional losses would have been recognized for the impaired value of the Petrodelta dividend receivable.

127.    In failing to recognize such impairments, Defendants were motivated to avoid both; (1) jeopardizing any sale of the Petrodelta investment; and (2) triggering a "going concern" qualification of Harvest Natural's own financial statements (as was ultimately issued by the auditors).  Indeed, upon information and belief, the refusal in February 2013 of the Indonesia

26

Government to purchase the Company's interest in Petrodelta reflected that Government's recognition that the collectability of dividends and future cash flows from Petrodelta were highly problematic.

**Improper Accounting For the MSD Loan Facility Related Warrants**

### Misclassification of the Warrants and Related Debt

128.    To properly account for "detachable" warrants issued in conjunction with a debt instrument (*i.e.*, those issued in connection with the MSD Loan Facility), the first step is to allocate the proceeds between the debt instrument and the warrants, based on their relative fair values. ASC 470-20-30-2.

129.    The next step is to analyze the warrants to determine whether they should be classified as liability or equity. Generally Accepted Accounting Principles ("GAAP") requires that all contracts initially be classified based on the required or assumed "settlement method."

    a. Generally, contracts that require net-*cash* settlement should be initially classified as either *assets or liabilities*; and contracts that require net settlement in *shares* should be classified as *equity* instruments.[10] (ASC 815-40-25-1).

    b. As ASC 815-40-25-8 makes clear, "Contracts that include any provision that could require net *cash* settlement *cannot be accounted for as equity* of the entity…." (Emphasis supplied.)

    c. GAAP also clearly provides that a contract cannot be accounted for as equity "if an event that is not within the entity's *control* could require net *cash* settlement." (ASC 815-40-25-8). (Emphasis Supplied)

---

[10] Contracts providing the issuing entity with a choice of settling in either shares or cash are assumed to be settled in shares, while contracts providing the counterparty with a choice of settling in shares or cash are assumed to be settled in cash. (ASC 815-40-25-2).

130.   In the case of the MSD Loan Facility Warrants, the mandatory accounting under the foregoing principles was very clear.  The WPA required a net-cash settlement in the event a "fundamental change" outside of the Company's control took place.  The WPA specified that such a "fundamental change" included any one of the following events:

      a.   A person or group becomes the direct or indirect owner of more than 50% of the voting power of the outstanding common stock;

      b.   A merger event or similar transaction in which the majority owners before the transaction fail to own a majority of the voting power of the Company after the transaction; or

      c.   Approval of a plan of liquidation or dissolution of the Company or sale of all or substantially all of the Company's assets.

131.   The presence of these "fundamental change" conditions compelled classification of the Warrants as liabilities, not equity.  This treatment is clearly set forth in the November 30, 2006 Current Accounting and Disclosure Issues in the Division of Corporation Finance, which lists a requirement that "warrants could be … settled in cash if certain events occurred, such as … in the event of a change of control" as one of the two most common reasons compelling accounting for warrants as liabilities.[11]

132.   Given such clear GAAP mandate, Defendants' failure to properly classify the Warrants as debt rather than equity, was a knowing or reckless disregard for the truth.

133.   The misclassification also enabled Defendants' to evade "mark to market" requirements for such "derivative liabilities."  As a result of the failure to mark-to-market, Harvest Natural avoided recognizing the following material adjustments:

---

[11] The SEC also reiterated that, according to U.S. GAAP, the probability of such event occurring is not a factor.

| (in thousands, except for EPS amounts) | 2010 | Q1'2011 | Q2'2011 | Q3'2011 | Q4'2011 | Q1'2012 | Q2'2012 | Q3'2012 |
|---|---|---|---|---|---|---|---|---|
| **Warrants Classification** | $ 344 | $(2,516) | $ 7,060 | $ 4,256 | $ 986 | $  432 | $(1,641) | $  249 |
| EPS Increase (Decrease) | $ 0.01 | $ (0.07) | $  0.21 | $ 0.11 | $ 0.03 | $ 0.01 | $ (0.04) | $  0.01 |
| (Over)understated Net Income by | 2.4% | (79.8%) | 7.6% | 40.1% | 2.2% | 41.5% | (26.4%) | 4.3% |

134.   Moreover, the improper classification of the Warrants materially understated Harvest Natural's year end 2010 liabilities and overstated its equity which significantly understated its debt to equity ratio:[12]

| (in 000's) | 2010 Original | | Warrants Reclass. | | Adjustments | | | | 2010 Revised | (Over)Under Stated |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Current Period | | Prior Periods | | | |
| Liabilities | $ | 111,389 | $ | 11,122 | $ | (344) | $ | - | $  122,167 | 8.8% |
| Equity | $ | 376,855 | $ | (11,122) | $ | (1,067) | $ | (693) | $  363,973 | (3.5%) |
| D/E Ratio | | 0.296 | | | | | | | 0.336 | 11.9% |

135.   Such material misclassification was motivated by Defendants' desire to inflate Harvest Natural's appearance of liquidity in order to avoid any "going concern" qualification from its auditors.

**The Improper Valuation of the Warrants,**
**and Resultant Understatement of the Warrant Related Discount**

136.   The material distortion of Harvest Natural's financial statement by the improper classification of the Warrants as equity was compounded by the fact that the Company materially understated the amount of their value and related discount on the MSD Loan Facility.  Whereas the Warrants were valued at $11.1 million, they were in fact worth $15 million (over 35% more) at the time the agreement was entered into.  Consequently, the recorded Warrant Related Discount was understated by 25%.  This understatement of value had significant financial

---

[12] Based on amounts reported in the original filing.

ramifications. Indeed, since the Warrants Related Discount was amortized to interest expense (*i.e.*, expensed against earnings), the amount of the interest expense was understated by 25%.

137. The improper 25% under-valuation of the Warrants had further adverse ramifications when the MSD Loan Facility was paid off in the second quarter of 2011, more than one year before its expiration.

     a. At this point GAAP required Harvest Natural to record a loss on the "extinguishment of debt" based on the remaining unamortized portion of the Warrant Related Discount plus the prepayment penalty and the related unamortized debt financing costs.

     b. Whereas the Company recognized a $9.7 million loss (including $7.2 million of unamortized Warrant Related Discount), the recognized loss should have been over $13 million.

**Improper Application of the Successful Efforts Method**

138. Companies involved in the exploration and development of crude oil and natural gas such as Harvest Natural have the option of choosing between two accounting approaches: the Successful Efforts method and the Full Cost method. These differ in the treatment of specific operating expenses relating to the exploration of new oil and natural gas reserves. The accounting method that a company chooses affects how its net income and cash flow numbers are reported.

139. The Successful Efforts method allows a company to capitalize only those expenses associated with successfully locating new oil and natural gas reserves. For unsuccessful (or "dry hole") results, the associated operating costs are immediately charged against earnings for that period. The alternative approach, known as the "Full Cost" method,

allows all operating expenses relating to locating new oil and gas reserves - regardless of the outcome - to be capitalized.

140.    Exploration costs capitalized under either method are recorded on the balance sheet as part of long-term assets.  This is because like the lathes, presses and other machinery used by a manufacturing concern, oil and natural gas reserves are considered productive assets for an oil and gas company, and GAAP requires that the costs to acquire those assets be charged against earnings as the assets are used.

141.    Since December 2007, Harvest Natural has used the Successful Efforts method of accounting for its oil and gas exploration and development activities.  As detailed in the Company's 2010 Form 10-K, it states the following concerning the successful efforts method:

> We follow the successful efforts method of accounting for our oil and gas properties. Under this method, exploration costs such as exploratory geological and geophysical costs, delay rentals and exploration overhead are charged against earnings as incurred. Costs of drilling exploratory wells are capitalized pending determination of whether proved reserves can be attributed to the area as a result of drilling the well. If management determines that proved reserves, as that term is defined in Securities and Exchange Commission ("SEC") regulations, have not been discovered, capitalized costs associated with exploratory wells are charged to exploration expense. Costs of drilling successful exploratory wells, all development wells, and related production equipment and facilities are capitalized and depleted or depreciated using the unit-of-production method as oil and gas is produced.

> Leasehold acquisition costs are initially capitalized. Acquisition costs of unproved leaseholds are assessed for impairment during the holding period and transferred to proved oil and gas properties to the extent associated with successful exploration activities. Costs of maintaining and retaining undeveloped leaseholds, as well as amortization and impairment of unsuccessful leases, are included in exploration expense. Costs of expired or abandoned leases are charged to exploration expense, while costs of productive leases are transferred to proved oil and gas properties.

> Costs of drilling and equipping successful exploratory wells, development wells, asset retirement liabilities and costs to construct or acquire offshore platforms and other facilities, are depreciated using the unit-of-production method based on total estimated proved developed reserves. Costs of acquiring proved properties,

including leasehold acquisition costs transferred from unproved leaseholds, are depleted using the unit-of-production method based on total estimated proved reserves. All other properties are stated at historical acquisition cost, net of allowance for impairment, and depreciated using the straight-line method over the useful lives of the assets.

142.   In the Company's 2012 Form 10-K, Harvest Natural admitted that it had improperly capitalized certain exploration overhead and certain leasehold maintenance and other costs to oil and gas properties.  By way of example, after correctly applying the Successful Efforts method, the Company, in connection with the restatement, admitted that it overstated net income by $2.2 million or 3.9% and $492,000 or 47.3% for these expenditures for the year 2011 and first quarter 2012, respectively.  Under the Successful Efforts method, Harvest Natural's net income was materially overstated by failing to expense the unsuccessful exploration costs.

143.   The analysis shown below sets the impact of improper capitalization of expenses:

| (in thousands) | 2010 | Q1'2011 | Q2'2011 | Q3'2011 | Q4'2011 | Q1'2012 | Q2'2012 | Q3'2012 |
|---|---|---|---|---|---|---|---|---|
| **Adjustment to the Exploration Expense** | $(313) | $ (110) | $ (125) | $(1,375) | $ (600) | $ (492) | $ (430) | $ (378) |
| Corresponding Overstatement of Net Income | (2.2%) | (3.5%) | (0.1%) | (13.0%) | (1.4%) | (47.3%) | (6.9%) | (6.6%) |

144.   These improper charges were attributable to the following operations:

| (in 000's) | Improper Capitalization | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2011 | Q1'2012 | Q2'2012 | Q3'2012 | Total |
| Venezuela | | | | | | - |
| Indonesia | | (1,653) | (380) | (353) | (273) | (2,659) |
| Gabon | (313) | (415) | (110) | (52) | (93) | (670) |
| Oman | | | | | | - |
| US (and other) | | (142) | (2) | (25) | (12) | (181) |
| Net | (313) | (2,210) | (492) | (430) | (378) | (3,510) |

145.   Defendants acted with knowledge or reckless disregard of the truth in failing to properly account for these costs.  By its own description "Harvest Natural Resources, Inc. is a petroleum exploration and production company incorporated [with the] focus ... on acquiring

exploration, development and producing properties in geological basins with proven active hydrocarbon systems." It has no other operations outside of the petroleum exploration industry and should be familiar with the Successful Efforts method of accounting.

## THE TRUTH BEGINS TO EMERGE

146.    The market's awareness of the true fragility of Harvest Natural's financial condition first emerged on February 20, 2013, when the Company disclosed that the previously announced sale of its interests in Petrodelta had been cancelled. This signaled to investors not only that Harvest Natural would be unable to raise critically needed cash, but that the value of Harvest Natural's investment in Petrodelta was likely impaired, and that it was unlikely that the Company would ever collect the long overdue $12 million dividend (still booked as an unimpaired asset) or any other future dividends.

147.    As a result of this clear warning flag, Harvest Natural's stock price fell over 33%, from $9.16 per share to $5.45 per share.

148.    On March 19, 2013, the Company filed a Form NT 10-K with the SEC, disclosing that it had to restate reported results for 2010, 2011 and 2012, citing among other things, improper capitalization rather than expensing of certain costs, and failing to recognized impairment of certain "long-lived" assets. Concurrently, the Company revealed that its auditors had issued a "going concern qualification" due to the Company's tenuous liquidity position. Specifically, the Company disclosed the following in relevant part:

> • Following discussions with the audit committee of our board of directors, management concluded that there were certain errors related to our incorrect capitalization of certain lease maintenance costs and certain internal selling, general and administrative costs. In addition we identified an error in the presentation of certain cash flow items and determined that certain long-lived assets have been impaired. Extra time is needed to determine the appropriate adjustments to such capitalized costs and the appropriate amounts by which our long-lived assets have been impaired.

• During the annual audit, certain errors were identified that will require the Company to revise and possibly restate its financial statements for certain periods in 2010, 2011 and 2012.

• The Company is in the process of completing its evaluation of its internal controls over financial reporting as of December 31, 2012 in accordance with Section 404 of the Sarbanes Oxley Act. Although such evaluation is not complete, the Company has determined that a material weakness existed in its controls over the accuracy and presentation of its accounting for certain long-lived assets. It is possible additional material weaknesses could be identified as a result of our analysis.

***

We anticipate that our results of operations for the year ended December 31, 2012 will reflect a net loss attributable to Harvest of approximately $9.6 million, or $0.26 per diluted share, compared with net income attributable to Harvest of $51.8 million, or $1.32 diluted earnings per share, for the year ended December 31, 2011….. In addition, due to our liquidity position, our auditors have informed us that their opinion will include a going concern qualification.

149.    On this news, Harvest Natural common stock plummeted $1.79 per share or more than 32%, to close at $3.70 per share on March 19, 2013.

150.    On April 3, 2013, the Company provided an update.  Specifically, the Company admitted the following in relevant part:

Financial Reporting and Control Issues

During the December 31, 2012 year end audit process, the following material weaknesses were identified.  Due to these weaknesses, the following errors were identified and adjustments will be made in current and previous SEC filings:

• The Company did not maintain effective internal control over the accuracy, valuation and application of generally accepted accounting principles related to the capitalization, classification and impairment of certain costs related to oil and gas properties.

• The Company did not maintain effective controls over significant and complex debt and equity transactions.

In connection with the preparation of our Annual Report on Form 10-K for the year ended December 31, 2012, the Company concluded that there were errors in previously filed financial statements.  These errors are outlined below:

- Certain warrants issued in 2010 in connection with our $60 million term loan facility (the "Warrants") were improperly valued at inception and improperly classified as equity instruments rather than liability instruments. As a result of the improper classification of the Warrants, the debt discount and associated interest expense related to the amortization of the debt discount was understated for all periods in which the associated debt was outstanding. Additionally, the consolidated statement of operations and comprehensive income (loss) for each reporting period was misstated by the omission of the changes in fair value of the Warrants as a liability instrument.

- As a result of the errors related to the Warrants described above, loss on extinguishment of debt was understated for the year ended December 31, 2011 and the quarters ended June 30, 2011, September 30, 2011 and December 31, 2011.

- Certain exploration overhead was incorrectly capitalized to unproved properties, which under the successful efforts method of accounting should have been expensed, and certain leasehold maintenance and other costs were improperly capitalized to oil and gas properties, which under the successful efforts method of accounting should have been expensed.

- In addition, advances to equity affiliate were improperly classified as an operating activity rather than an investing activity and certain costs were improperly classified as an investing activity rather than an operating activity on the consolidated statement of cash flows.

- An additional error was identified related to the improper expensing of costs associated with debt conversions that should have been recorded to equity for the quarters ended March 31, 2012 and September 30, 2012.
-
    The Company is also evaluating the permanent reinvestment assertion related to certain tax matters.  Many of these corrections are period to period adjustments and will have a non-cash impact to the Company.

*** 

Going Concern
The Company's financial statements for the year ended December 31, 2012 have been prepared under the assumption that Harvest will continue as a going concern. *Our audit report will include an explanatory paragraph expressing substantial doubt about our ability to continue as a going concern.*

(Emphasis Supplied)

35

151.   On May 2, 2013, the Company filed a Form 10-K for the year ended December

31, 2012 detailing its restatement for financial statements for years 2010 and 2011 and quarterly

periods from March 31, 2011 through September 30, 2012.   Specifically, the Company admitted

the following:

> In connection with the preparation of our Annual Report on Form 10-K for the
> year ended December 31, 2012, we concluded that there were errors in previously
> filed financial statements. In the course of our review, management determined
> that (a) certain warrants issued in 2010 in connection with our $60 million term
> loan facility (the "Warrants") were improperly valued at inception and improperly
> classified as equity instruments rather than liability instruments. As a result of the
> improper classification of the Warrants, (b) the debt discount and associated
> interest expense related to the amortization of the debt discount was understated
> for all periods in which the associated debt was outstanding, and (c) the
> consolidated statement of operations and comprehensive income (loss) for each
> reporting period was misstated by the omission of the changes in fair value of the
> Warrants as a liability instrument. Additionally, (d) certain exploration overhead
> was incorrectly capitalized to oil and gas properties, which under the successful
> efforts method of accounting should have been expensed, and (e) certain
> leasehold maintenance and other costs were improperly capitalized to oil and gas
> properties, which under the successful efforts method of accounting should have
> been expensed. Finally, (f) advances to equity affiliate were improperly classified
> as an operating activity rather than an investing activity and (g) certain costs were
> improperly classified as an investing activity rather than an operating activity on
> the consolidated statement of cash flows. Such errors impacted annual periods
> ended December 31, 2010 and 2011 and quarterly periods ended March 31, 2011,
> June 30, 2011, September 30, 2011, December 31, 2011, March 31, 2012, June
> 30, 2012, and September 30, 2012.
>
> As a result of the errors related to the Warrants described above, loss on
> extinguishment of debt was understated for the year ended December 31, 2011
> and the quarters ended June 30, 2011, September 30, 2011 and December 31,
> 2011.
>
> In assessing the severity of the errors, management determined that the errors
> were material to the consolidated financial statements for the years ended
> December 31, 2011 and 2010 and quarterly information for all quarters in 2011
> and the first, second and third quarters of 2012. In addition to the errors described
> above, we made corrections for previously identified immaterial errors and errors
> affecting classification within the consolidated statement of operations and
> comprehensive income (loss) related to impairment of oil and gas properties and
> income taxes and the consolidated balance sheets related to income taxes.

\*\*\*

These warrant agreements include provisions wherein we may be required to settle the warrant agreement by transferring assets. Consequently, under ASC 480-10-25-8, these warrants must be treated as a derivative liability, bifurcated from the host instrument, and recorded at fair value at each reporting date. In the occurrence of a fundamental change, we are required to repurchase the Warrants at the higher of (1) the fair market value of the warrant and (2) a valuation based on a computation of the option value of the Warrant using the Black-Scholes calculation method using the assumptions described in the Warrant Agreement. A fundamental change is defined as "the occurrence of one of the following events: a) a person or group becomes the direct or indirect owner of more than 50% of the voting power of the outstanding common stock, b) a merger event or similar transaction in which the majority owners before the transaction fail to own a majority of the voting power of the Company after the transaction, and c) approval of a plan of liquidation or dissolution of the Company or sale of all or substantially all of the Company's assets."

152.    Also, the Form 10-K included a report from Company's Independent Registered

Public Accounting Firm, PwC.  In its report, PwC concluded the following:

[I]n our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because material weaknesses in internal control over financial reporting related to … (2) accounting for certain transactions for oil and gas properties;…; (4) appropriate segregation of duties related to certain system access rights and the recording and review of journal entries; (5) preparation and review of certain classification and disclosure matters impacting the financial statements and related notes; and (6) accounting for significant and complex debt and equity transactions existed as of that date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis….

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has not generated revenue and has incurred recurring losses and negative cash flows from operations that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

153.    On May 3, 2013, the Company announced financial results for the fourth quarter and year ended December 31, 2012.  The chart below sets forth the original and restated amounts relevant to this action.

| | 2010 | Q1'2011 | Q2'2011 | Q3'2011 | Q4'2011 | Q1'2012 | Q2'2012 | Q3'2012 |
|---|---|---|---|---|---|---|---|---|
| Originally Reported | | | | | | | | |
| Net Income (Loss) | $15,442 | $1,082 | $89,780 | $ 7,711 | $(44,679) | $ (1,392) | $ 8,160 | $ 5,817 |
| EPS | $   0.42 | $ 0.02 | $    2.23 | $   0.20 | $ (1.08) | $ (0.04) | $   0.20 | $   0.15 |
| | | | | | | | | |
| Net Income Increase (Decrease) | | | | | | | | |
| **Warrants Valuation** | $(1,098) | $(1,578) | $(3,932) | $    - | $    - | $    - | $    - | $    - |
| EPS Increase (Decrease) (Over)understated Net Income by | $  (0.03) | $  (0.04) | $ (0.12) | $    - | $    - | $    - | $    - | $    - |
| | (7.6%) | (50.1%) | (4.2%) | - | - | - | - | - |
| | | | | | | | | |
| **Warrants Classification** | $   344 | $(2,516) | $ 7,060 | $ 4,256 | $  986 | $  432 | $(1,641) | $ 249 |
| EPS Increase (Decrease) (Over)understated Net Income by | $   0.01 | $  (0.07) | $   0.21 | $   0.11 | $  0.03 | $   0.01 | $ (0.04) | $   0.01 |
| | 2.4% | (79.8%) | 7.6% | 40.1% | 2.2% | 41.5% | (26.4%) | 4.3% |
| | | | | | | | | |
| **Application of SE Method** | $  (313) | $  (110) | $  (125) | $(1,375) | $ (600) | $  (492) | $  (430) | $ (378) |
| EPS Increase (Decrease) (Over)understated Net Income by | $  (0.01) | $    - | $    - | $ (0.04) | $ (0.02) | $  (0.01) | $ (0.01) | $(0.01) |
| | (2.2%) | (3.5%) | (0.1%) | (13.0%) | (1.4%) | (47.3%) | (6.9%) | (6.6%) |
| | | | | | | | | |
| **Other** | $    - | $   (30) | $   30 | $   12 | $  (12) | $  412 | $  136 | $  63 |
| EPS Increase (Decrease) (Over)understated Net Income by | $    - | $    - | $    - | $    - | $    - | $  0.01 | $    - | $    - |
| | - | (1.0%) | - | 0.1% | - | 39.6% | 2.2% | 1.1% |
| | | | | | | | | |
| **Total** | $(1,067) | $(4,234) | $ 3,033 | $ 2,893 | $  374 | $  352 | $(1,935) | $   (66) |
| EPS Increase (Decrease) (Over)understated Net Income by | $  (0.03) | $  (0.12) | $   0.09 | $  0.08 | $  0.01 | $   0.01 | $ (0.05) | $    - |
| | (7.4%) | (134.3%) | 3.3% | 27.3% | 0.8% | 33.8% | (31.1%) | (1.1%) |
| Restated | | | | | | | | |
| Net Income (Loss) | $14,375 | $(3,152) | $92,813 | $10,604 | $(44,305) | $ (1,040) | $ 6,225 | $ 5,751 |
| EPS | $  0.39 | $ (0.10) | $   2.73 | $   0.28 | $ (1.27) | $ (0.03) | $   0.15 | $   0.15 |

154.    Equally important, the Company admitted for the first time that it was *in breach of its loan covenants* due to the auditor's qualified opinion regarding its ability to operate as a "going concern."

38

155.   On May 3, 2013, the Company held a conference call with analysts where the Defendants provided further details on the restatement.   Specifically, Defendant Haynes disclosed the following in relevant part:

> A large adjustments for 2011 related to $3.3 million impairment of oil and gas properties that were previously presented exploration expense, $9.8 million which represents change in fair value of the warrants for the period. These warrants were issued with a bridge loan which closed in October 2010 and have a five-year life. These warrants were previously classified as equity and were therefore not marked to market at the end of the each reporting period. Also a loss on extinguishment of debt of $3.5 million was recognized due to the misclassification of warrants in 2010. It should be noted these adjustments were all non-cash.

156.   During the conference call, Defendant Edmiston commented the following in relevant part:

> Now let me turn my comments to liquidity, as you know our independent auditors included growing concern comment in audit opinion. Basically that opinion is based on the fact that we have added commitments within the next 12 months, which exceed our cash on hand. Further, given that we have not received dividends from Petrodelta in three years, they did not consider declared dividends payable from Petrodelta nor undeclared dividends in their analysis.

157.   On June 21, 2013, the Company disclosed in a press release and a Form 8-K that it dismissed PwC as its independent public accounting firm and engaged UHY LLP to become its new independent public accounting firm.

## ADDITIONAL SCIENTER ALLEGATIONS

158.   Defendants, by virtue of their executive positions in charge of Harvest Natural's core operations, routinely received confidential financial information concerning Harvest Natural true condition which was not reflected in the Company's publicly reports, and thus knew, or recklessly disregarded, the falsity of the Company's publicly reported financial statements.  Such knowledge included awareness of material internal control flaws which enabled the Company to manipulate reported results.

159.    In particular, in issuing its report, PwC observed that "the Company did not maintain, in all material respects, effective internal control over financial reporting" because the Company had material weaknesses, including "appropriate segregation of duties related to certain system access rights and the recording and review of journal entries." This specific material weakness created a corporate environment ripe for manipulation, particularly with respect to the capitalization of oil exploration expenses.

160.    Defendants were motivated to issue the false and misleading statements during the Class Period to avoid recognizing any impairment of its Petrodelta investment (which would have precluded its ability to unload the asset). Defendants were also motivated to secure desperately needed cash in order for the Company to avoid any "going concern" qualification that would result in breach of loan covenants and other adverse financial consequences.

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

161.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Harvest Natural common stock during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

162.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Harvest Natural common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members

of the Class may be identified from records maintained by Harvest Natural or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

164. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

165. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Harvest Natural;

- whether the Individual Defendants caused Harvest Natural to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Harvest Natural common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

166. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

167.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Harvest Natural common stock is traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Lead Plaintiffs and members of the Class purchased and/or sold Harvest Natural common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

168.    Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

169.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

171.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Harvest Natural common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Harvest Natural common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

172.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Harvest Natural common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Harvest Natural's finances and business prospects.

173. By virtue of their positions at Harvest Natural, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

174. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Harvest Natural, the Individual Defendants had knowledge of the details of Harvest Natural internal affairs.

175. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Harvest Natural. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Harvest Natural's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Harvest Natural common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Harvest Natural's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the

other members of the Class purchased Harvest Natural common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

176.    During the Class Period, Harvest Natural common stock was traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Harvest Natural common stock at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased said common stock, or would not have purchased it at the inflated prices that were paid.  At the time of the purchases by Lead Plaintiffs and the Class, the true value of Harvest Natural common stock was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.   The market price of Harvest Natural common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

177.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

179.    Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180.    During the Class Period, the Individual Defendants participated in the operation and management of Harvest Natural, and conducted and participated, directly and indirectly, in the conduct of Harvest Natural's business affairs.  Because of their senior positions, they knew the adverse non-public information about Harvest Natural's misstatement of income and expenses and false financial statements.

181.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Harvest Natural's financial condition and results of operations, and to correct promptly any public statements issued by Harvest Natural which had become materially false or misleading.

182.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Harvest Natural disseminated in the marketplace during the Class Period concerning Harvest Natural's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Harvest Natural to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Harvest Natural within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Harvest Natural common stock.

183.  Each of the Individual Defendants, therefore, acted as a controlling person of Harvest Natural.  By reason of their senior management positions and/or being directors of Harvest Natural, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Harvest Natural to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Harvest Natural and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

184.  By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Harvest Natural.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representative;

B.  Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: June 28, 2013

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS, LLP**

By */s Marc I. Gross*
Marc I. Gross
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS, LLP**
Patrick V. Dahlstrom
Ten North LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

*Plaintiffs' Lead Counsel*

**BRONSTEIN GEWIRTZ & GROSSMAN LLP**
Peretz Bronstein
60 E. 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Counsel For Plaintiff John Phillips*

**ABRAHAM, WATKINS, NICHOLS, SORRELS, AGOSTO & FRIEND**
Sammy Ford IV
Federal Bar Number: 950682
Texas Bar Number: 2406133
Chelsea K. Garza
800 Commerce Street
Houston, TX 77002
Telephone: 713-222-7211
Facsimile: 713-225-0827

*Plaintiffs' Local Counsel*

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served by electronic CM/ECF filing on this 28th day of June, 2013.

Executed on June 28, 2013 in New York, New York.

s/ *Marc I. Gross*
Marc I. Gross