UNITED STATES DISTRICT COURT            SOUTHERN DISTRICT OF TEXAS

United States District Court
Southern District of Texas
**ENTERED**
August 25, 2016
David J. Bradley, Clerk

| | |
|---|---|
| John Phillips, *et al.*, | § |
| Plaintiffs, | § § § |
| *versus* | § § |
| Harvest Natural Resources, Inc., *et al.*, | § § § |
| Defendants. | § |

Civil Action H-13-801

# Opinion on Dismissal

1. *Introduction.*

   Investors in an oil and gas company have sued it because they say that it misled them about its financial health. Because the company fully disclosed its risky investments in South America, it will prevail.

2. *Background.*

   Starting in 1992, Harvest Natural Resources, Inc., operated oilfields owned by Venezuela's national oil company. In 2005, Venezuela declared all operating agreements illegal. One year later, Harvest converted its agreement into a 40% interest in Petrodelta S.A.— a nationalized oil company in the Bolivarian Republic of Venezuela. This new arrangement switched Harvest's primary source of cash from direct payments to dividends. Investors overwhelmingly approved this conversion – 30,910,607 voting in favor, 133,118 voting against or abstaining.

   Shortly later, Venezuela began withholding Petrodelta's profits. It demanded that the company reinvest its cash into its operations and placed oppressive taxes on it. A $93 million dividend in 2008 was a $12.2 million dividend in 2010. A second dividend of $12.2 million was announced in November of 2010, but it was never paid.

   Harvest warned investors in its annual disclosures that the dividend had not been paid, and it was uncertain if it would receive future dividends. It said that Petrodelta's dividend was Harvest's primary income and that its value was being eroded by the erratic behavior of

Case 4:13-cv-00801   Document 87   Filed in TXSD on 08/25/16   Page 2 of 5

Venezuela. Throughout this time, Harvest listed the unpaid dividend and the value of Petrodelta as unimpaired assets.

Frustrated with Venezuela, Harvest announced that it was trying sell its interest in Petrodelta. Its stock rose 23%. In June of 2012, Harvest said that it had agreed to sell it for $725 million to Pertamina Corporation – a company owned by the Republic of Indonesia. The sale was subject to approval by Venezuela and Indonesia. A few months later, Indonesia vetoed the sale, and Harvest's stock dropped more than 40%, from $9.16 to $5.45 per share.

In March of 2013, during its annual audit, minor errors were discovered that required a restatement of its finances. The company improperly accounted for some commercial paper that it had issued and capitalized some exploration costs. This restatement led to an aggregate decline of $650,000 in income from 2010 through 2012 – a mere 1.2% drop. The company also revealed that its auditors had substantial doubts about the company's ability to stay in business. Its stock dropped another 32%.

John Phillips, an investor, sued Harvest on behalf of his fellow investors who bought its common stock between 2011 and 2013. Phillips says that Harvest knowingly or recklessly misled investors in order to artificially inflate the price of its stock and retain access to credit.

3. *Corporation Liability.*

To state a claim for securities fraud the facts in the plaintiffs' complaint must raise a strong inference that a materially false statement was made by the defendants with fraudulent intent or scienter, and that the false statement caused the plaintiffs' loss.[1] A strong inference is more than a permissible inference– a reasonable person must find it cogent and compelling.[2] In evaluating the sufficiency of the pleaded facts, the court (a) accepts all factual allegations in the amended complaint as true; (b) reviews that facts collectively rather than in isolation; and (c) weighs whether scienter is at least as likely an opposing inference.[3]

---

[1] *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532-533 (2008).

[2] *Tellabs, Inc. v. Makor Issues & Rights, LTD.*, 551 U.S. 308, 324, 329 (2007).

[3] Id.

4. *Petrodelta.*

To recover, Phillips must plead specific facts showing that Harvest's statements were substantially false and that they caused a specific loss. To survive dismissal, he must describe knowingly deceitful or manipulative acts that affected the stock market.

This complaint arises from two drops in the stock price: (a) the 40% decrease in February of 2013 after the sale of Petrodelta was vetoed by Indonesia; and (b) the 32% drop in March of 2013 when Harvest announced its restatement.

In its annual disclosures, Harvest repeatedly warned investors about Petrodelta. In 2010, it told investors that its value was almost completely dependent on Venezuela. Petrodelta was forced to pay more taxes and reinvest its earnings, rather than pay dividends. Harvest also warned that the sale of Petrodelta was contingent on Venezuela's and Indonesia's approval.

Phillips has found no lies about Petrodelta. He also has not accused Harvest of not disclosing facts that would have affected the value of the asset. He says only that Harvest should have impaired its interest in Petrodela and lowered its value in their books.

The value of an asset is impaired if its book value has fallen below the market value. To prevail, Phillips must demonstrate that impairment was so obvious that it was no longer a matter of business judgment.

Phillips has not identified an accounting rule that required Harvest's interest in Petrodelta to be impaired. He generally says that Petrodelta had a bleak outlook: (a) Venezuela owed Harvest almost $1 billion, (b) it appeared to have stopped paying dividends, and (c) Harvest had only $2.3 million in cash.

Phillips has not shown that Petrodelta's book value in 2011 was higher than its market value. Harvest valued the company at between $290 and $360 million. That Harvest was able to find a buyer willing to pay $725 million shows that Harvest's valuation was not unreasonable. Phillips has pleaded no specific facts showing that Harvest's classification of Petrodelta was an error reasonably affecting the market's ability to decide how to respond to Harvest's book.

5. *Restatement.*

By restating its finances for eight consecutive quarters, Harvest has admitted that some of its statements needed to be revised. Not all revisions are actionable. To state a claim, the errors must amount to a significant change in the eyes of a reasonable investor.

Phillips says that the revisions were significant because the errors resulted in some quarterly earnings being overstated by more than 100%. He points to the 32% drop in Harvest's stock that followed the announcement of the restatement.

The restatement resulted in an aggregate reduction of $650,000 of net earnings from 2010 through 2012. This adjustment accounted for less than two percent of its $58 million in earnings. Some statistics that investors track, such as diluted earnings per share, increased as a result of the restatement.

A reasonable investor would not have considered this minor restatement significant. These errors were not a substantial change for Harvest. Its stock price dropped following the restatement because investors were skittish after the canceled sale of Petrodelta. The stock dropped 32% in March when the restatement was announced, but only five percent when the extent of it was disclosed.

Phillips has not shown anything to suggest that Harvest acted with an intent to deceive. He says that Harvest was motivated by its desperate need to raise capital in order to stay in business. He infers – imaginarily – that the only way Harvest could make these mistakes was if it acted with knowing or with reckless disregard for the truth. He projects rather than knows.

Publication of inaccurate accounting figures, a restatement, or a failure to follow generally accepted accounting principles do not alone support a finding of recklessness. Mistakes happen. Never ascribe to malice that which can be explained by stupidity or laziness.

During the time in question, Harvest's disclosures were reviewed and approved by PricewaterhouseCoopers LLP. That a major accounting firm approved the filings shows that the errors were not so obvious that their publication demonstrates an intent to defraud investors.

Accounting mistakes without accompanying false statements or other aggravating circumstances are not enough to infer malice. Corporations should be encouraged to revise and restate.

6.  *Director Liability.*

James A. Edmiston and Stephen C. Haynes are two of the directors of Harvest. Phillips says that they played an integral role in deciding what was told to investors and the development of the deals. He says that they misled the investors by not telling them everything that they knew.

Because the company is not liable, the directors may not be found liable. To state a claim for controlling-person liability under section 20(a), Phillips must first plead an underlying claim under section 10(b) – he must show that the company is liable to impute liability to the directors. Phillips has not stated a claim under section 10(b), and therefore cannot seek relief under section 20(a). The directors will not be found liable.

7. *Leave to Amend.*

Phillips ends his response to Harvest's motion by requesting leave to amend his petition. This court has already granted leave once, and Phillips does not say what additional facts or arguments he would add to his forty-seven page amended complaint. The court will not further delay the resolution of this case because of an imprecise and vague request.

8. *Conclusion.*

The plaintiffs will take nothing from Harvest Natural Resources, Inc., James A. Edmiston, and Stephen C. Haynes.

Signed on August 25, 2016, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge